IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

| | |
|---|---|
| VANDA GRACE CROWE, AS HEIR AT LAW, ADMINISTRATRIX, AND PERSONAL REPRESENTATIVE OF THE ESTATE OF MICHAEL GRACE | PLAINTIFF |
| V. | CAUSE NO. 3:11-CV-00366-CWR-LRA |
| MISSISSIPPI DIVISION OF MEDICAID AND MISSISSIPPI DEPARTMENT OF REHABILITATION SERVICES | DEFENDANTS |

## ORDER DENYING MOTION TO DISMISS

The breadth of the Americans with Disabilities Act is difficult to overstate. Its pronouncements have been hailed by no less than the Supreme Court as a "broad mandate" with a "sweeping purpose,"[1] and as "a milestone on the path to a more decent, tolerant, progressive society."[2] The ADA does not impose upon states a duty of care for its disabled citizens,[3] but it does explicitly define discrimination in far-reaching yet specific terms.[4]

Against that backdrop comes this case, which presents the question of whether it is possible for a government program specifically designed for the disabled to discriminate on the basis of a disability. Given the ADA's broad, sweeping mandate, and that statute's far-reaching

---

[1] *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001).

[2] *Id.* (quoting *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 375 (2001) (Kennedy, J., concurring)).

[3] *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 n.14 (1999).

[4] *See* Am. Jur. 2d *Americans with Disabilities Act* § 265, n.33 (2012).

1

definition of discrimination,[5] the Court finds that question must be answered in the affirmative. Therefore, the motion to dismiss is denied.

## FACTS

In 1981, Michael Grace suffered an injury to his spinal cord in a car crash and became paralyzed from the neck down. He qualified for Mississippi's Traumatic Brain Injury/Spinal Cord Injury Waiver Program (hereinafter "the waiver program"), which is authorized under Section 1915(c) of the Social Security Act and is administered by the Mississippi Division of Medicaid and the Mississippi Department of Rehabilitation Services (hereinafter collectively "the State"). The program supplies participants with attendant services, medical supplies, medical equipment, and other services.[6]

Initially, the Department of Rehabilitation Services designed a plan for Grace that called for 24-hour attendant services. At some point, though, the State reduced Grace's plan to 18 hours per day.[7] Grace does not allege in his Complaint whether the change came pursuant to a broader change in policy or was unique to him.[8] According to Grace, the six hours per day during which

---

[5] *See* 42 U.S.C. § 12101(a-b); *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011).

[6] Complaint [Docket No. 1] at 2.

[7] Complaint at 2.

[8] This case is before the Court on a Rule 12(b)(6) motion, which requires the Court to accept all well pled allegations as true facts and to "draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). Therefore, at this point, the Court must infer from the Complaint that the changes in Grace's plan were unique to him and not the result of a broader change in the program.

he was not cared for led him to suffer a host of physical ailments.[9]

Grace requested an increase for his attendant services under the waiver program, but the State denied the application. When Grace appealed,[10] he presented evidence of his physical suffering to an agency hearing officer, but the State's decision to deny additional attendant services was upheld.[11] For a period of time that he does not specify, Grace continued to request increases in his attendant care plan on a quarterly basis, but his requests never were granted.[12]

At a date Grace does not specify, he requested "a local Medicaid hearing to challenge the [State's] denial of additional attendant care services." After the hearing, Grace's request again was denied.[13]

Eventually, at a time Grace again does not specify, he filed a complaint against the State with the Office for Civil Rights of the Department of Health and Human Services. Grace alleged violations of Title II of the Americans with Disabilities Act (hereinafter "Title II") and of Section 504 of the Rehabilitation Act (hereinafter "Section 504") stemming from the State's denials of his requests for increases in attendant services.[14] According to Grace, the Office for Civil Rights "found that [the State] had failed to make reasonable modifications to policy and procedure as

---

[9] Complaint at 3.

[10] Grace does not elaborate on the details of this "appeal," but it appears to be some sort of administrative appeal.

[11] Complaint at 3-4.

[12] Complaint at 4.

[13] Complaint at 5.

[14] Complaint at 5.

required by [Title II and Section 504] and, therefore, had discriminated against Grace based on his disability"[15] and "ordered [the State] to provide Grace with 24-hour attendant care services."[16]

The record contains no documents related to any administrative appeal. However, the record does contain an 18-page letter from the Office for Civil Rights to the State and to a group representing Grace, and the letter memorializes the finding that the State violated Title II and Section 504.[17]

On June 17, 2011, Grace[18] filed suit in district court against the State, alleging violations of Title II and Section 504.[19] On October 13, 2011, after having filed an Answer,[20] the State moved to dismiss.[21]

## ANALYSIS

The State's motion to dismiss rests on two arguments. First, the State contends that it is immune from this suit under the Eleventh Amendment to the U.S. Constitution. Second, the State

---

[15] Complaint at 8.

[16] Complaint at 8.

[17] Exhibit A to Plaintiff's Response to Defendants Motion to Dismiss and Additionally or Alternatively Motion to Amend [Docket No. 18-1].

[18] During the pendency of this litigation, Grace died on September 18, 2011. Suggestion of Death and Motion to Substitute Party-Plaintiff [Docket No. 27] at 1. The magistrate judge granted leave to substitute on February 1, 2012. The plaintiff is now Vanda Grace Crowe, administratrix of the estate of Michael Grace, and the styling of this Order reflects that change. However, for the sake of consistency, the plaintiff is referred to throughout this discussion as "Grace."

[19] Complaint at 8-9.

[20] Defendants' Answer and Affirmative Defenses [Docket No. 8].

[21] Defendants' Motion to Dismiss on the Basis of Eleventh Amendment Immunity and Other Grounds [Docket No. 11].

contends that Grace cannot prove discrimination on the basis of a disability because the program in which he participated was designed solely for the benefit of the disabled. Neither argument is compelling.

**Eleventh Amendment Immunity.** The Eleventh Amendment establishes that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although the Amendment's text appears not to contemplate the issue, courts universally recognize that the sovereign immunity established by the Amendment extends also to shield a non-consenting state against suits brought by its own citizens.[22] However, "Congress may abrogate state sovereign immunity pursuant to the enforcement power conferred by § 5 of the Fourteenth Amendment."[23]

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance[.]"[24] Additionally, Title 42, Section 2000d-7 of the United States Code "conditions a state's receipt of federal funds on its waiver of Eleventh Amendment immunity to actions under § 504."[25] The Fifth Circuit has held

---

[22] *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996).

[23] *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 451 (5th Cir. 2005). Section 5 of the Fourteenth Amendment reads: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

[24] 29 U.S.C. § 794(a).

[25] *Bennett-Nelson*, 431 F.3d at 451.

that this abrogation is valid.[26] Therefore, the Eleventh Amendment does not preclude Grace's suit under Section 504 of the Rehabilitation Act.[27]

And because of the substantive similarity between Title II and Section 504, the Court needs not evaluate the question of whether the Title II claim likewise falls within Congress' abrogation of the Eleventh Amendment.[28] Sovereign immunity is of no avail.

**Discrimination Within a Program Designed for the Disabled.** The State's second argument is that Grace could not have suffered discrimination on the basis of his disability because he was participating in a program designed solely for the disabled.[29] The State relies on

---

[26] *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 280-87 (5th Cir. 2005).

[27] *Tennessee v. Lane*, 541 U.S. 509, 533-34 (2004).

[28] In *Bennett-Nelson*, the Fifth Circuit observed that Title II and Section 504 are almost identical creatures and that "[t]he only material difference between the two provisions lies in their respective causation requirements." *Bennett-Nelson*, 431 F.3d at 454. Specifically, Section 504 establishes that "[n]o otherwise qualified individual with a disability in the United States . . . shall, *solely by reason of her or his disability*, be . . . subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." *Id.* (quoting 29 U.S.C. § 794(a) (emphasis added)). On the other hand, under Title II, "discrimination need not be the sole reason" for the exclusion at issue. *Id.* (quoting *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 253 (5th Cir. 1996). And after the *Bennett-Nelson* Court determined that Section 504 abrogated the Eleventh Amendment, it found unnecessary the task of determining whether the plaintiff's Title II claim also survived sovereign immunity because the issue at hand did not relate to causation, which is the only manner in which Section 504 and Title II are distinct from one another. *Id.* at 454. See also *Durrenberger v. Texas Dep't of Criminal Justice*, 757 F. Supp. 2d 640, 648-49 (S.D. Tex. 2010) (Lake, J.) (citing *Bennett-Nelson*, 431 F.3d at 455) (unnecessary to determine whether a Title II claim abrogates the Eleventh Amendment when an identical Section 504 claim does so and where the claims address not causation but whether the defendant failed to make a reasonable accommodation); *McCoy v. Texas Dep't of Criminal Justice*, 2006 WL 2331055, **4-5 (S.D. Tex. 2006) (Jack, J.) (same holding).

[29] State's Brief at 1 ("[A] state program that serves only the disabled cannot logically engage in the kind of disability-based discrimination prohibited by the ADA and the Rehabilitation Act.").

the Supreme Court's clear holding that the Americans with Disabilities Act does not "impose[ ] on the States a standard of care for whatever medical services they render, [n]or [does] the ADA require[ ] States to provide a certain level of benefits to individuals with disabilities."[30] Therefore, in the State's view, Grace's claim is not that he was discriminated against on the basis of his disability but, instead, that he was denied a level of desired benefits;[31] additionally, according to the State, "it appears that every federal court that has considered the issue has found that a level of service dispute within a program serving only the disabled does not state a claim of intentional discrimination under the ADA or the Rehabilitation Act."[32]

Title II of the ADA, as set forth at Title 42, Section 12132 of the United States Code, establishes that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The ADA's chief purpose "is to assure that handicapped individuals receive evenhanded treatment in relation to nonhandicapped individuals."[33] In order to state a claim under Title II of the ADA, a plaintiff must assert "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3)

---

[30] *Olmstead v. L.C.*, 527 U.S. 581, 603 n.14 (1999) (Ginsburg, J.) (quotations omitted).

[31] State's Brief at 5-6.

[32] State's Brief at 6.

[33] *Traynor v. Turnage*, 485 U.S. 535, 548 (1988).

that such discrimination is by reason of his disability."[34]

When Congress enacted the Americans with Disabilities Act in 1990, it did so in light of a number of explicit findings, including its determination that "historically, society has tended to isolate . . . individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]"[35] Additionally, Congress found that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, . . . and relegation to lesser services, programs, . . . benefits, or other opportunities[.]"[36]

Pursuant to Congress' direction,[37] the Attorney General promulgated regulations to effectuate the ADA's commands. One such regulation is the "reasonable-modifications regulation,"[38] which provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."[39]

---

[34] *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

[35] 42 U.S.C. § 12101(2).

[36] 42 U.S.C. § 12101(5).

[37] 42 U.S.C. 12134(a) ("[T]he Attorney General shall promulgate regulations in an accessible format that implement this part.").

[38] *See Olmstead*, 527 U.S. at 592; *Abrahams v. MTA Long Island Bus*, 644 F.3d 110, 121 (2nd Cir. 2011); *Cruz v. Dudek*, 2010 WL 4284955, *10 (S.D. Fla. Oct. 12, 2010).

[39] 28 C.F.R. § 35.130(b)(7).

In the case at hand, the State does not contend that the waiver program through which Grace procured his attendant services was not a "service[ ], program[ ], or activit[y] of a public entity,"[40] and it does not take the position that Grace's condition failed to qualify as a "disability," as that term is used within the ADA. Instead, the State's argument is that because the waiver program was designed specifically for the disabled, any decisions made therein relevant to Grace could not have been made with the intention of discriminating on the basis of a disability.

In response, Grace argues that a case centrally relied on by the State directly undercuts its position. In *Olmstead v. L.C.*,[41] the Supreme Court addressed claims brought under Title II by two mentally disabled, institutionalized plaintiffs against the State of Georgia. The *Olmstead* plaintiffs argued that they could receive adequate attention in a community-based treatment setting and that their continued institutionalization violated Title II because it amounted to a failure to make a reasonable modification to a policy.[42] The Supreme Court agreed and held for the plaintiffs. That fact alone, Grace argues, demonstrates that a program designed to aid the disabled *can* discriminate against its participants in violation of the ADA. This Court agrees.

In response, the State argues that *Olmstead* is relevant only when a plaintiff takes issue with the location of his services; in contrast, in the State's view, Grace's claim concerns the level of benefits he received under the waiver program.

This Court rejects the State's narrow framing of Grace's claim, of *Olmstead*, and of the

---

[40] 42 U.S.C. § 12132.

[41] *Olmstead*, 527 U.S. 581.

[42] *Id.* at 593-94.

9

ADA's proscriptive purpose. As an initial matter, the State is not the first defendant in a Title II suit to argue that it cannot logically discriminate on the basis of a disability when it is administering a program designed specifically for the disabled. The *Olmstead* Court itself tackled the theory when, in *Olmstead*, "[t]he State argue[d] that [the plaintiffs] encountered no discrimination by reason of their disabilities because they were not denied community placement on account of those disabilities."[43] The defendant reasoned in *Olmstead*, as the State reasons in the case at bar, that it had not discriminated against the plaintiffs "because discrimination necessarily requires uneven treatment of similarly situated individuals, and [the plaintiffs] had identified no comparison class, i.e., no similarly situated individuals given preferential treatment."[44] The Supreme Court disagreed and was "satisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA."[45]

Likewise, this Court must view *Olmstead* broadly rather than, as the State urges, as a precedent limited strictly to its facts. Obviously, *Olmstead* featured facts that do not appear in the case at bar. But it is not the product merely of some narrow provision requiring that disabled patients at an institution be released into a community setting when the circumstances warrant it; rather, *Olmstead* was the result of the "broad mandate" and "sweeping purpose"[46] of the ADA, which "has been described as 'a milestone on the path to a more decent, tolerant, progressive

---

[43] *Olmstead*, 527 U.S. at 598.

[44] *Id.*

[45] *Id.*

[46] *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001).

society.'"[47] *Olmstead* stands broadly for the proposition that "[a]lthough the ADA does not itself mandate the provision of services, it does prohibit discrimination against the disabled within the services that *are* provided."[48] To put it another way, "[a] public entity, in providing any aid, benefit, or service, may not, on the basis of disability, . . . deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service."[49]

And fundamentally, that is Grace's claim. Grace does not argue that the State was obligated to create out of thin air a 24-hour attendant care program for his sole benefit; he simply argues that the failure to provide him with that service amounted to discrimination. Notwithstanding the State's contention that one cannot discriminate against the disabled within a program designed for the disabled, Congress expressly identified the "*failure to make modifications to existing . . . practices*, exclusionary qualification standards and criteria, . . . and *relegation to lesser services, programs, . . . benefits, or other opportunities*"[50] as forms of discrimination specifically targeted by the ADA. This is precisely the injury alleged by Grace, and his contention that the State refused to restore him to 24-hour attendant care amounts to an allegation that the State failed in its charge to "make reasonable modification in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the

---

[47] *Id.* (quoting *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 375 (2001) (Kennedy, J., concurring)).

[48] *Buchanan v. Maine*, 469 F.3d 158, 174 (1st Cir. 2006) (emphasis in original).

[49] Am. Jur. 2d *Americans with Disabilities Act* § 265 (2012).

[50] *Supra* at n.33 (emphases added).

basis of disability[.]"[51] The fact that the modification at issue in the case at bar is not absolutely identical to the modification discussed by *Olmstead* does not mean that decision rebukes Grace's claim.

A closer examination of the State's arguments provides further reason for denying its motion to dismiss. For example, the State claims sweepingly that "every federal court that has considered the issue [presented by Grace] has found that a level of service dispute within a program serving only the disabled does not state a claim of intentional discrimination under the ADA or the Rehabilitation Act."[52] In support of that statement, the State relies on two decisions from the Second Circuit, both issued prior to the *Olmstead* decision.[53] The first, *Doe v. Pfrommer*, concerned a plaintiff suffering from personality disorder and participating in a vocational rehabilitation program. The plaintiff received services from the vocational rehabilitation program but asked for additional services, and that request was denied because he did not qualify for them. The plaintiff sued under the ADA and Section 504, but the Second Circuit held that no violation had occurred because the statutes did not require the State defendants "to modify their programs to meet all of Doe's needs as a disabled individual."[54]

But in the case at bar, Grace has not asked the State to create a new plan for him or to warp the waiver program so that it meets all of his needs. Grace simply asked the State to

---

[51] *Supra* at n.36.

[52] State's Brief at 12.

[53] *See Doe v. Pfrommer*, 148 F.3d 73 (2nd Cir. 1998); *Flight v. Gloeckler*, 68 F.3d 61 (2nd Cir. 1995).

[54] *Doe*, 148 F.3d at 83.

continue providing service that already existed and for which it had determined that he qualified.[55]

This is not to suggest that a disabled applicant for services who receives fewer services than he would like suddenly has a claim under Title II or Section 504.[56] But where one qualifies for a public entity's services and nevertheless is denied their benefit, then he has been "denied the benefits of services, programs, or activities for which the public entity is responsible[.]"[57]

The State's position, at its essence, is that *Olmstead* stands for the proposition that a public program designed specifically for the disabled cannot logically discriminate against the disabled unless its actions implicate the setting at which its services are to be rendered. That is simply too narrow a view to comport with the ADA's expressed broad purpose.

Finally, although the argument is offered only in passing, the State contends in its reply brief that, at best, Grace has pled a claim that would entitle him only to injunctive relief rather

---

[55] *Supra* at n.2.

[56] *See Doe*, 148 F.3d 73.

[57] *Supra* at n.31 (elements of a Title II claim). One of the State's arguments is relevant on this point and deserves specific mention. In its reply brief, the State writes, "Mr. Grace has cited and the State's research has revealed no case in which a plaintiff has been allowed to predicate an *Olmstead* claim exclusively upon the denial of benefits the State has never deemed medically necessary for the plaintiff." Defendants' Rebuttal to Plaintiff's Response to Motion to Dismiss [Docket No. 21] (hereinafter "State's Reply Brief") at 14. That simply is not the scenario presented by Grace's Complaint. This is not a situation where the services at issue are services that "the State has never deemed medically necessary for the plaintiff." According to the Complaint, the State's own agents developed Grace's original plan, which called for 24-hour attendant care. If the State disputes that contention, then that is its right, but such an argument plainly would not support a motion to dismiss under Rule 12(b)(6), which obligates the Court to view all of the Complaint's representations as true.

than monetary damages.[58] The Supreme Court has held that "Title II authorizes suits by private citizens for money damages against public entities that violate § 12132."[59] Therefore, the Court rejects this argument as a basis for dismissal.

## CONCLUSION

The Eleventh Amendment does not protect the State from this suit. Additionally, the Supreme Court's *Olmstead* decision stands for the broad proposition that a State program designed for the disabled can still discriminate against the disabled. Grace's complaint pleads a legal theory that *could* entitle him to relief. Discovery might reveal that he is entitled to no relief. But here, the question is whether Grace has stated a claim for relief. He has. Therefore, the State's motion to dismiss is denied.

SO ORDERED this Fourteenth day of September 2012.

/s/ *Carlton W. Reeves*
Hon. Carlton W. Reeves
United States District Court Judge

---

[58] State's Reply Brief at 17 ("*Olmstead* has never been held to make damages available under the ADA or the Rehabilitation Act for merely making it more likely that a plaintiff will have to seek nursing home care.").

[59] *United States v. Georgia*, 546 U.S. 151, 154 (2006) (Scalia, J.).